# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| CONNECTED GLOBAL SOLUTIONS, LLC, ) | |
| ) | **Redacted Version 9.8.2022** |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| AMERICAN ROLL-ON ROLL-OFF ) | |
| CARRIER GROUP, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 22-292C |
| ) | (Judge Tapp) |
| THE UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| HOMESAFE ALLIANCE, LLC, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

## DECLARATION OF GENERAL JACQUELINE D. VAN OVOST

1. I, General Jacqueline D. Van Ovost, make the following declaration in lieu of an affidavit, as permitted by Section 1746 of Title 28 of the United States Code. I understand this declaration is the equivalent of a statement under oath. This declaration is provided for the limited purpose of describing the harms Department of Defense (DOD) Servicemembers, civilians, and their respective families will suffer if the Court grants Plaintiffs' requests to enjoin the current award, reevaluate the offerors' proposals, and make a new source selection decision for DOD's Global Household Goods Contract (GHC). I make this declaration based on my personal knowledge and information provided to me in my official capacity.

2. I have served as the Combatant Commander, U.S. Transportation Command (USTRANSCOM) since October 2021. In my role, I am responsible for the administration and execution of the Defense Personal Property Program (DP3).

1

**Defense Personal Property Program (DP3) – Current Program Overview**

3. Each year, the DP3 is responsible for typically moving more than 300,000 personal property shipments for Servicemembers, DOD civilians, and their families to assignments across the globe in support of national security objectives. One of the most stressful portions of the relocation process involves shipping personal property (household goods). Approximately 40% of these household goods moves occur between 15 May and 31 August each year, which is the period referred to as "peak season." DOD's assignment cycle causes increased utilization pressure on commercial capacity (packing/unpacking crews and drivers) during this time. To support these moves, each year DOD relies on over 900 individual moving companies that are managed by DOD's 42 regional household goods shipping offices. For many reasons, the current Defense Personal Property approach is not working effectively or efficiently, and these shortcomings directly impact the quality of life and morale of our Servicemembers and their families, which in turn impact DOD's overall warfighting readiness and retention. Issues under the current program include:

   a. **DOD has been unable to hold moving companies adequately accountable for poor performance.** The current construct consists of per move agreements, not formal contracts, with over 900 competing companies. The companies function as van lines, transportation agents, third party logistics providers, storage facilities, and truck owner/operators. When a Servicemember's move goes wrong or the moving companies fail to comply with the DP3 standards and policies, DOD issues letters of warning and suspensions in a best attempt to exercise oversight over the 900 individual moving companies. One letter of warning may contain multiple infractions committed by a single moving company, and DOD issues a suspension (which precludes the company from performing household goods movements) when a moving company continues to commit the same infractions even after government intervention or the company fails to take corrective action. In 2020, the 42 regional household goods shipping offices separately issued over 35,000 letters of warning detailing areas where moving companies operated outside the bounds of program guidelines, many of which were repeat offenders. Additionally, DOD subsequently issued over 1,400 suspensions when those problems remained unaddressed. The 35,000 letters of warning demonstrate an overwhelming number of poor performance issues Servicemembers and their families experienced during their move, and the 1,400 suspensions illustrate the moving companies' refusal to correct their performance problems. While DOD may exclude the use of a company due to poor performance, doing so only exacerbates our capacity constraints during peak season. Furthermore, the household goods industry has developed a method to circumvent DOD's household goods award system by using a shell game with the moving company identification codes it manages, essentially allowing poor performing companies to continue to move our Servicemembers' household goods. Because of this, *DOD's well-intended punitive actions do not result in meaningful resolution of performance issues by our moving companies from a program-wide perspective, thereby allowing poor performing moving companies to continue to move Servicemembers and their families and repeating the same deficiencies with other Servicemembers and their families.*

   b. **Customer satisfaction metrics and claims.** Approximately 6% of Servicemembers who completed a customer satisfaction survey over the past 3 years reported being unsatisfied with their move. With over 300,000 moves a year, that correlates to approximately 18,000 unsatisfied families year after year. Reasons for dissatisfaction ranged from late pickups

2

and deliveries, lost or damaged household goods, poor or lengthy claims settlement experiences, unprofessional moving crews, and poor customer service (e.g., long wait times, infrequent status updates). On average, 50,000 claims are submitted each year for losses and damages. Unfortunately, it takes moving companies 80 days on average to settle Servicemember claims.

c. **Lack of – and inefficient use of – capacity.** In day-to-day operations, the transactional nature of the current DOD household goods moving approach results in inefficient crew and truck utilization. For example, it is common practice for large logistics companies such as FedEx and UPS to consolidate shipments in order to make the most efficient use of their crews and trucks, resulting in a more timely and reliable delivery service. The current DP3 structure, however, makes it impossible for DOD to group shipments originating on the same street, zip code, or military installation. More broadly, the DP3 transactional approach hinders the moving industry's ability to conduct long-term planning and offers no meaningful basis to invest in relationships with agents or assets to respond to DOD's fairly predictable demand. Furthermore, not only does the current state of operations strain existing capacity it also serves as a deterrent for new moving companies to join the program because of DOD's vast body of regulations and processes, which exists to normalize processes for over 900 companies. While many in DOD see these rules and workflows as prudent shipment allocation and oversight procedures, the moving companies have described them as bewildering and over-engineered. Moving industry representatives who are unaffiliated with the current program have stated these existing rules make DOD an unattractive partner. *Lack of capacity directly relates to our Servicemembers' move experience in the form of untimely service.* Examples include a Servicemember not being able to schedule the pickup or delivery of his or her household goods during a desired timeframe, or worse, the Servicemember schedules the pickup or delivery date, and the moving company does not show up. A delayed moving schedule is impactful for any family, but especially military families who need to clear base-housing or rental properties in a timely manner to comply with their DOD orders. *Over the past three years, moving companies have missed the promised delivery date of Servicemembers' household goods by an average of 80,000 families a year (25% of all moves).* Moving company delays averaged close to two weeks over this period. This is two weeks DOD families did not have their household goods while trying to settle into their new home or apartment and adjust to a new location.

d. **Poor communication throughout the move process.** As mentioned, the current process consists of companies that touch various elements of a move, such as van lines, transportation agents, third party logistics providers, storage facilities, and truck owner/operators. Frequently, a Servicemember's family will have one company scheduling packing services, another company entering their home and packing their household goods, another company transporting the shipment, another company delivering their household goods, and a fifth company processing the family's claim. This fragmented customer support approach leads to gaps and seams with poor communication throughout the move process - leaving Servicemembers and their families not knowing who to call at the various points in the process when things go wrong.

3

4. Combined, these factors present DOD with the same set of challenges each peak season: quality capacity is lacking, and DOD has limited accountability measures to drive improvements. Over the years, DOD has worked tirelessly to implement program changes to improve our Servicemembers' move experience, resulting in marginal enhancements given the inability to establish effective and lasting change in the current fragmented program. To address these challenges fully, by providing DOD Servicemembers and families the quality service they deserve and Congress demands, DOD must restructure its relationship with industry. GHC is that solution.

**The Necessity to Implement the Global Household Goods Contract (GHC)**

5. Following the 2018 peak moving season, USTRANSCOM began receiving multiple reports and inquiries from individual customers, media sources, and Congress concerning accountability and the quality of moves for Servicemembers. While the DP3 receives and addresses complaints and inquiries each year, the scale and nature of the issues highlighted in 2018 appeared to be the result of mounting frustrations by Servicemembers due to poorly executed moves (missed pickups, missed deliveries, poor communication from moving companies, and loss/damage of household goods as detailed above). An additional factor that accelerated the inertia behind the desire for accountability and higher-quality moves was the filing of a change.org petition—created by a military veteran who is also a military spouse—which received over 100,000 signatures (*see* https://www.change.org/p/secretaries-of-the-armed-forces-and-congress-hold-military-moving-companies-accountable-9a32e967-975f-424e-8027-0137a503d438). While some of the data stated in the petition did not reflect current program-level statistical analysis, the genesis and general nature of the petition underscored the widespread and growing perception that an acute degradation of DOD's moving service occurred over the preceding several years.

6. Subsequently, USTRANSCOM began receiving numerous Congressional inquiries about systemic household goods moving program issues. For example, in September of 2018 the House Armed Services Committee (HASC) wrote USTRANSCOM about how the current process "fails to ease the transition between military assignments and increases stress on military families and commands," and how lengthy delays in scheduling household good moves are "so extensive that they impacted readiness." In October of 2018, USTRANSCOM received a letter from four senators requesting DOD make vital program changes. The senators cited to specific examples of moving companies losing entire crates of personal belongings, family heirlooms going missing, and a child's entire room never making it to its final destination. Then, in early 2019, USTRANSCOM sent letters to the HASC, Senate Armed Services Committee (SASC), and the four forementioned senators communicating DOD's initiative to improve Servicemembers' moving experience drastically by pursuing a contract for end-to-end transportation and storage processes by a single move manager, the Global Household Goods Contract (GHC).

7. The GHC fundamentally will restructure DOD's relationship with private industry to generate quality capacity in the program, affix accountability to moving companies, and give DOD customers a single source to resolve any challenges related to their move. The new construct will improve our Servicemembers' and their families moving experience because:

   a. Customers will have a single point of contact, which will simplify communication throughout the move. This will alleviate Servicemembers' continued problems with missed pickups, missed deliveries, and poor communication from moving companies. GHC will

4

improve the Servicemember and family move experience and result in better service at the curb.

b. GHC will increase the quality of moves and accountability. HomeSafe Alliance, the company that received the GHC contract, must adhere to high quality customer-facing standards such as timely scheduling, on-time pickup, on-time delivery, and high customer satisfaction ratings. HomeSafe Alliance is incentivized to meet high quality standards because doing so allows it to earn up to two additional years of contract performance (approximately 25% of the contract's total projected revenue).

c. GHC will increase capacity by centralizing demand planning with a single entity to improve utilization of available capacity in a way DOD cannot do (similar to the FedEx and UPS models). Furthermore, capacity naturally will increase as moving companies who previously were deterred from what they felt were DOD's complicated rulesets can easily partner with HomeSafe Alliance. Increased capacity directly correlates to timely customer service, including optimal scheduling of service for our Servicemembers and their families, less missed pickups, and less missed deliveries.

8. It is important to note the move-manager concept is not novel. DOD moves Servicemembers' Privately Owned Vehicles (POVs) (approximately 60,000 to 70,0000 per year) under a single award move manager contract, which has achieved a 99.8% customer satisfaction rate for the past 2 years. Similarly, GHC radically will improve the moving experience for the over 300,000 Servicemembers and their families annually, by making one move manager the single responsible entity for the movement of household goods, with USTRANSCOM and the military departments maintaining complete oversight over HomeSafe Alliance's performance.

**Delay of GHC Implementation will Negatively Impact Servicemembers**

9. Military service is a stressful profession. Maintaining the status quo of the current, problematic DP3 program will continue to add unnecessary layers of stress to Servicemembers and their families. As described above, the current process results in, among other things, high numbers of lost or damaged items, missed pickup and delivery dates, and confusion about who to contact if problems arise due to fragmented communication throughout the move process, and lack of meaningful accountability for the moving companies involved. Our Servicemembers deserve a better moving experience. Until DOD can move forward with the GHC contract it cannot meaningfully address the quality of the relocation process, which undeniably impacts the quality of life and morale of our Servicemembers and their families, during what is already a stressful time in their lives - a direct impact on warfighter readiness, retention, and DOD's ability to defend our nation.

**Cost**

10. The House of Representatives Department of Defense Appropriations Bill, 2021 Report 116-453, section on "Movement of Household Goods" directed the USTRANSCOM Commander to submit possible cost savings associated with the GHC to the Congressional Defense Committees. On 28 October 2021, I informed the Congressional Defense Committees, based on in-depth analysis from my staff, moving to the GHC construct is estimated to save the government ▮▮▮▮ from Fiscal Year (FY) 2022 through FY 2026. A copy of the analysis is in Attachment 1. The analysis compared DOD's spending in the current household goods program to HomeSafe Alliance's (the

5

GHC apparent awardee) rates. Of note, the analysis was conducted completely separate from the GHC source selection. Nothing in the cost saving analysis was considered during the GHC source selection evaluation or best value decision.

11. Based on the cost savings analysis, specifically Attachment 1 Cost Savings Report, any future delays as a result of a court order to enjoin the current award results in the government's inability to realize approximately ▓▓▓▓ of cost savings related to the movement of Servicemembers, DOD civilians, and their families' household goods. While improving the "at the curb" experience for DOD families is the cornerstone of GHC, dramatic cost savings for our taxpayers further bolsters the urgent necessity for GHC implementation.

## Summary

12. The current program to move our Servicemember's household goods is fractured, outdated, and does not provide the customer service our Servicemembers deserve. As directed by Congress, DOD restructured the DP3 program and its relationship with industry by awarding the GHC, which will correct current issues and provide a better moving experience for our military families. Further delays will only prolong achieving better service, and continue to cost DOD more than the new and improved program as noted in the Attachment, and result in an adverse impact to the force, warfighter morale, retention, readiness, and DOD's ability to defend our nation.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 14 Jun 22

Jacqueline D. Van Ovost
General, USAF
Commander

Attachment:

1. Cost Savings Report

6

CUI/SSEL - SEE FAR 2.101 & 3.104

Enclosure:  Global Household Goods Contract (GHC) Projected Savings



**Notes and Assumptions:**

- Projected savings only apply to those moving and storage services associated with the GHC.  Other elements of the Personal Property Program (non-temporary storage, Privately Owned Vehicle shipments, etc.) are not considered.  Similarly, potential changes to Government staffing levels were not included.

- Used FY2021 Tender of Service Rates to calculate 'as is' (current program) costs.  Estimates assume increases each year due to inflation only.
    - Used the USAF Raw Inflation Index of 2.1% (avg. across contract life).

- Rates from the GHC apparent awardee were used to calculate 'to be' costs.
    - Contract includes annual price adjustments for fuel and market conditions.
    - Escalations estimated used the MarkIT index of 2.03% (avg. across contract life).

- Services should be cautious when contemplating budget changes until the contract is in performance and actual inflation rates are better understood.

- GHC implementation will be delayed about 100 days (for example, due to protest).  Estimate assumes shipments under GHC will begin in December 2022

- The FY22 increase (negative savings) reflects the contract transition costs while continuing to run the legacy program.

- Volumes during FY22-FY26 will be similar to FY19 volumes.

- No change to existing Joint Travel Regulation Weight Allowances *(note: shipping more will cost more)*.

- Counseling included on 100% of shipments under GHC *(note: Services will only pay for services they order).*

**Controlled by:**  USTRANSCOM
**Controlled by:**  Directorate of Acquisition
**CUI Category:**  SSEL
**Limited Dissemination Control:**  FED ONLY
**POC:**  CO Lynda Lang, (618) 220-7092